IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| NESPRESSO USA, INC.,<br><br>Plaintiff,<br><br>v.<br><br>ETHICAL COFFEE COMPANY SA,<br><br>Defendant –<br>Counterclaim Plaintiff.<br><br>ETHICAL COFFEE COMPANY SA and<br>ETHICAL COFFEE CORPORATION,<br>Counterclaim Plaintiffs,<br><br>v.<br><br>NESPRESSO USA, INC.,<br>NESTLÉ NESPRESSO SA, NESTLÉ SA<br>and NESTEC SA,<br><br>Counterclaim Defendants. | Civil Action No. 16-194-GMS |

## MEMORANDUM OPINION

### I. INTRODUCTION

On December 21, 2015, Nespresso USA filed a complaint against Ethical Coffee Company SA ("ECC") requesting declaratory judgment that Nespresso USA does not infringe ECC's U.S. Patent No. 9,113,746 (the "'746 Patent"). (D.I. 1 ¶ 30–31). On April 18, 2016, ECC answered the complaint, and counterclaimed that Nespresso USA, Nestlé Nespresso SA, Nestlé SA ("Nestlé"), and Nestec SA ("Nestec") infringe the '746 Patent, violate the Sherman Act, conduct unfair

competition, and commit unjust enrichment. (D.I. 24 ¶ 1–3).[1] On August 10, 2016, Nestlé and Nestec filed a motion to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2). (D.I. 51–52). For the reasons that follow, court will grant the motion to dismiss.

## II. BACKGROUND

Nestlé is a corporation organized under the laws of Switzerland, and with its principal place of business in Switzerland. (D.I. 54 ¶ 2–3). Nestec is also a corporation organized under the laws of Switzerland, and with its principal place of business in Switzerland. (D.I. 55 ¶ 2–3). Each of the named defendants are related to each other through a shared corporate hierarchy. (D.I. 41 ¶ 7–8). Nespresso USA is a subsidiary of Nestlé Nespresso SA, which is a direct subsidiary of Nestlé. (D.I. 54 ¶ 13). Nestec is an affiliate of Nestlé Nespresso SA, and Nespresso USA, and a wholly owned subsidiary of Nestlé. *Id.*

The degree to which Nestlé and Nestec are involved with the actions giving rise to the present suit is contested. (D.I. 52 at 3–5); (D.I. 58 at 2–8). ECC contends that Nestlé and Nestec "coordinate and execute the manufacture, import, marketing, distribution, and sale of the accused Nespresso machines in the U.S." (D.I. 58 at 2). ECC uses the declaration of Jean-Paul Gaillard ("Gaillard"), the chairman and founder of ECC, to allege that "Nestlé SA was and remains responsible for ultimate decision making with respect to the development and manufacturing of Nespresso products, production, research, and development and technical specifications." (D.I. 60

---

[1] The unfair competition and unjust enrichment claims were dismissed on September 7, 2016. (D.I. 64). All claims related to the infringement of the '746 Patent were dismissed on February 2, 2017. (D.I. 93). There are two pending motions to amend the answer and counterclaims. (D.I. 72); (D.I. 94).

2

¶¶ 1, 7). And that "Nestec SA was and is mainly a 'service company' with the task to ensure and supervise implementation of Nestlé SA central policies." *Id.* ¶ 9.

Nestlé and Nestec deny the aforementioned allegations, and offer two declarations to allege Nestlé and Nestec do not have contacts with the United States or Delaware. (D.I. 54, 55). Ricardo Cortes-Monroy, the Senior Vice President and General Counsel of Nestlé, asserts that Nestlé is not registered to do business in the U.S., does not maintain a registered agent for service, own any real property, offices, manufacturing plants, research facilities, have a mailing address or telephone listing in the U.S., or engage in the espresso market in the U.S. through sales or product development. (D.I. 54 ¶¶ 4–11). Odette Dupont, the Vice President of Nestec, asserts similar claims as Ricardo Cortes-Monroy, while also asserting Nestec has its own board of directors, Nestec's officers make the day-to-day operating decisions of Nestec, and that "Nestec did not design or manufacture Nespresso's Original Line machines." (D.I. 55 ¶¶ 5–14).

### III. STANDARD OF REVIEW

The court must dismiss a case when it lacks personal jurisdiction over the defendant. Fed. R. Civ. P. 12(b)(2); *Freres v. SPI Pharma, Inc.*, 629 F. Supp. 2d 374, 382 (D. Del. 2009). The plaintiff bears the burden of establishing that the defendants are properly subject to the court's jurisdiction. *See ICT Pharm., Inc. v. Boehringer Ingelheim Pharm., Inc.*, 147 F. Supp. 2d 268, 270–71 (D. Del. 2001). Because no evidentiary hearing occurred, the plaintiff bears the burden of alleging facts sufficient to make a *prima facie* case of personal jurisdiction over the defendant. *Telcordia Techs., Inc. v. Alcatel S.A.*, No. 04-874 GMS, 2005 U.S. Dist. LEXIS 10194, at *5 (D. Del. May 27, 2005). To satisfy this burden, the plaintiff must adduce facts which "establish with

reasonable particularity" that jurisdiction over Nestlé or Nestec exists. *See Joint Stock Soc'y v. Heublein, Inc.*, 936 F. Supp. 177, 193 (D. Del. 1996).

Personal jurisdiction is derived from two separate sources: state statutory law and U.S. constitutional due process. *Inamed Corp. v. Kuzmak*, 249 F.3d 1356, 1359–60 (Fed. Cir. 2001). The Delaware long-arm statute, however, has been construed "broadly to confer jurisdiction to the maximum extent possible under the Due Process Clause," so the focus of the inquiry traditionally rests on the constitutional component. Del. Code. Ann. Tit. 10 § 3104 (West 2017); s*ee Merck & Co., Inc. v. Barr Labs., Inc.*, 179 F. Supp. 2d 368, 372 (D. Del. 2002) (citing *Hercules Inc. v. Leu Trust & Banking Ltd.*, 611 A.2d 476, 480–81 (Del. 1992)).[2]

"[D]ue process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. State of Wash., Office of Unemployment Compensation & Placement*, 326 U.S. 310, 316 (1945) (internal quotation marks omitted). Since the Supreme Court initially announced this rule in *International Shoe*, the doctrine has split into two categories: specific and general jurisdiction. Specific jurisdiction exists where "the defendant has 'purposefully directed' his activities at residents of the forum, and the litigation results from alleged injuries that 'arise out of or relate to' those activities." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472–73 (1985) (internal citations omitted) (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984);

---

[2] The court recognizes that "Delaware law is ... unclear as to whether or not the long arm statute is coextensive with the due process clause," and whether separate analyses are required. *See Commissariat A L'Energie Atomique v. Chi Mei Optoelecs. Corp.*, 395 F.3d 1315, 1322 (Fed. Cir. 2005); *see also ICT Pharm.*, 147 F. Supp. 2d at 271 n.4 ("[T]he Delaware Supreme Court has not collapsed the analysis under the Delaware long-arm statute into the constitutional due process analysis, as some courts have done."). The parties have not challenged jurisdiction under Delaware's long-arm statute, however, so the court directs its attention to the constitutional analysis.

*Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984)). In contrast, general jurisdiction does not require that the cause of action arise out of contacts with the forum state. *Helicopteros*, 466 U.S. 408 at 421. Rather, general jurisdiction exists where the defendant's contacts with the forum "are so continuous and systematic as to render it essentially at home in the forum State." *Daimler AG v. Bauman*, 134 S. Ct. 746, 761 (2014) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2851 (2011)). Recent Supreme Court opinions confirm that "specific jurisdiction has become the centerpiece of modern jurisdiction theory," whereas general jurisdiction—often referred to as "all-purpose" jurisdiction—"[has played] a reduced role." *Id.* at 755 (alteration in original) (quoting *Goodyear*, 131 S. Ct. at 2854).

## IV. DISCUSSION

### A. General Jurisdiction

The court will first examine whether Nestlé or Nestec are "at home" in Delaware, and thereby subject to general jurisdiction. *Daimler AG v. Bauman*, 134 S. Ct. 746, 751 (2014). Nespresso USA stated Nestlé and Nestec are corporations organized in Switzerland, and have their principal places of business in Switzerland. (D.I. 41 ¶¶ 7–8). ECC agrees that Nestlé and Nestec are Swiss corporations with their principal places of businesses in Switzerland. (D.I. 24 ¶¶ 7–8; D.I. 46 ¶¶ 7–8). For jurisdictional purposes, a corporation's principal place of business is its "nerve center"—"the place where the corporation's high level officers direct, control, and coordinate the corporation's activities." *Hertz Corp. v. Friend*, 559 U.S. 77, 80, 97 (2010). Because Nestlé's and Nestec's nerve centers are in Switzerland, and there are no ties between the companies and Delaware that render them essentially at home in this state, they cannot be subject to general jurisdiction here. *See Daimler*, 134 S. Ct. at 755–56, 760 (holding that the place of incorporation

5

and principal place of business are the primary loci where the exercise of general jurisdiction is proper).

### B. Specific Jurisdiction

#### 1. Stream of Commerce Theory

ECC contends that Nestlé and Nestec are subject to personal jurisdiction under the stream of commerce theory. According to that theory, a foreign corporation can be subject to a forum state's jurisdiction if the foreign entity "purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958). ECC argues that Nestlé and Nestec helped to "develop, manufacture, import, distribute, market, and sell, the Nespresso products . . . and monopolize the U.S. marketplace." (D.I. 58 at 11). Further, ECC contends that Nestlé's intent to serve the United States generally, in addition to the billions of dollars Nestlé made through the U.S. market, demonstrates that Nestlé can be held accountable for the sold products introduced into the U.S. market. *Id.*

The court finds this argument unpersuasive for several reasons. One reason is that Nestlé did not introduce the Nespresso machines into the stream of commerce. The record indicates Nestlé "had no role in the design, manufacture, distribution, marketing, or sale of the Nespresso Original Line machines," (D.I. 69 ¶ 4), and "does not engage in any manufacturing or sales activities related to espresso machines, espresso capsules, or any other product in the United States." (D.I. 54 ¶ 10). Nestlé also has no influence regarding the "pricing, product design, manufacturing, or sales decisions made by Nestec S.A., . . . or Nespresso USA." *Id.* ¶ 15. As a result, ECC is unable to demonstrate Nestlé or Nestec placed—or otherwise influenced the

6

placement of—the Nespresso machines into either the United States market generally or the Delaware market specifically. *Goodyear*, 131 S. Ct. at 2849 ("[E]xercises of specific jurisdiction . . . [are only allowed when] a nonresident defendant, acting *outside* the forum, places in the stream of commerce a product that ultimately causes harm *inside* the forum.").

ECC contends that Nestlé and Nestec, as parent companies of the Nespresso USA subsidiary, can be held responsible for the actions of Nespresso USA. (D.I. 24 ¶¶ 13–14). To the extent this argument affects the stream of commerce analysis, Third Circuit case law has found that "mere ownership of a subsidiary does not justify the imposition of liability on the parent." *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 484 (3d Cir. 2001); *see United States v. Bestfoods*, 524 U.S. 51, 69 (1998). In other words, ECC would have to demonstrate that Nestlé and Nestec were responsible for introducing the Nespresso machines into the stream of commerce, and not simply that a subsidiary within the United States introduced the Nespresso machines. No evidence in the record indicates that Nestlé and Nestec are responsible for introducing the Nespresso machines into the U.S. or Delaware markets, and therefore ECC's argument is unpersuasive.

ECC also contends that Nestec, by owning the patents for the Nespresso machines involved in this matter, is subject to personal jurisdiction. (D.I. 58 at 6–7). The court has previously determined that "ownership of a United States patent, without more, cannot support the assertion of personal jurisdiction over a foreign patentee in any state." *Telcordia Techs., Inc. v. Alcatel S.A.*, No. 04-874 GMS, 2005 U.S. Dist. LEXIS 10194, at *23 (D. Del. May 27, 2005) (quoting *Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc.*, 1996 U.S. Dist. LEXIS 11696, No. C-95-3577 DLJ, 1996 WL 467293, at *6 n.5 (N.D. Cal. July 24, 1996)). Therefore, ECC would need to demonstrate

7

additional criteria in order for Delaware to hold personal jurisdiction over Nestec. In addition, the dismissal of all patent-related claims from the February 2, 2017 order strains the connection between owning a U.S. patent and the issues at hand in the present case. (D.I. 93, 96).

For the reasons explained above, ECC has not made a *prima facie* showing that Nestlé or Nestec would be subject to Delaware's personal jurisdiction under a stream of commerce theory.

### 2. Agency Theory

ECC also contends that Nestlé and Nestec are subject to personal jurisdiction under the agency theory. (D.I. 58 at 1). The agency theory "examines the degree of control which the parent exercises over the subsidiary." *Applied Biosystems, Inc. v. Cruachem, Ltd.*, 772 F. Supp. 1458, 1463 (D. Del. Sept. 6, 1991). To determine whether an agency relationship exists, a court will examine the following factors: "the extent of overlap of officers and directors, methods of financing, the division of responsibility for day-to-day management, and the process by which each corporation obtains its business." *Id.* ECC alleges, *inter alia*, that Nestlé and Nestec dictate the policies and strategies of Nespresso USA, take credit for all Nespresso USA activities regarding sales, employment, and property, place the Nestlé logo on Nespresso products, control the Nespresso websites, and share their corporate officers with Nespresso. (D.I. 58 at 2–8).

The presented evidence for the agency theory, however, is not sufficient to meet ECC's burden. Although two individuals from Nespresso SA share a leadership role with Nestlé, and one additionally holds a leadership position with Nestec, the court has previously found such a tenuous connection to be a "minor overlap," which is "not dispositive" for finding agency. *Telcordia*, 2005 U.S. Dist. LEXIS 10194 at *11 (D. Del. May 27, 2005); *see Bestfoods*, 524 U.S. at 69 ("[I]t is entirely appropriate for directors of a parent corporation to serve as directors of a subsidiary, and

8

that fact alone may not serve to expose the parent corporation to liability for its subsidiary's acts."). As for the argument that agency over Nespresso USA is found in an annual review attributing all financial and corporate successes to Nestlé, this line of reasoning does not establish that Nestlé controlled Nespresso USA regarding matters of patent infringement or antitrust, nor does it even consider or allege whether such actions are normal for a large corporation with many subsidiaries. Furthermore, "regulatory filings present[ing] the assets, liabilities, and financial earnings of its subsidiaries as one indistinguishable whole" do not prove agency. *Alcoa, Inc. v. Alcan, Inc.*, No. 06-451-SLR, 2007 U.S. Dist. LEXIS 51565, at *8-9 (D. Del. July 17, 2007) (internal quotation marks omitted). For the same reasons, Nestlé setting the corporate policies and procedures for all subsidiaries is not sufficient evidence of agency. *See Monsanto Co. v. Syngenta Seeds, Inc.*, 443 F. Supp. 2d 636, 644-45 (D. Del. 2006). As discussed previously, Nestec's ownership of U.S. patents does not create the necessary contacts needed to invoke personal jurisdiction, and therefore this argument fails to establish Nestlé's or Nestec's control over Nespresso USA's or Nespresso SA's day-to-day management.

Thus, ECC has failed to establish a *prima facie* case for agency theory, and therefore cannot support Nestlé and Nestec being subjected to personal jurisdiction in Delaware.

### C. Personal Jurisdiction under Federal Rule of Civil Procedure 4(k)(2)

ECC also argues that Federal Rule of Civil Procedure 4(k)(2) gives the court personal jurisdiction over Nestlé and Nestec. (D.I. 58 at 18). However, as discussed above, ECC has not demonstrated that enforcing personal jurisdiction over Nestlé or Nestec "is consistent with the United States Constitution and laws." Fed. R. Civ. P. 4(k)(2)(B). The Fourteenth Amendment—in particular the Due Process Clause—forms the constitutional basis for the jurisdictional tests

created by *International Shoe* and progeny. *Daimler AG v. Bauman*, 134 S. Ct. 746, 748–51 (2014) (providing history of modern jurisdictional analysis); *Shaffer v. Heitner*, 433 U.S. 186, 207 (1977) ("The standard for determining whether an exercise of jurisdiction . . . is consistent with the Due Process Clause is the minimum-contacts standards elucidated in *International Shoe*.") Since minimum contacts have not been established through either a stream of commerce or agency approach, *ipso facto*, personal jurisdiction cannot be predicated on Fed. R. Civ. P. 4(k)(2).

### D. Jurisdictional Discovery

ECC argues that even if the court is reluctant to deny Nestec and Nestlé's motion it should, at the least, order jurisdictional discovery. District courts typically order jurisdictional discovery when the plaintiff "presents factual allegations that suggest 'with reasonable particularity' the possible existence of the requisite 'contacts between [the party] and the forum state.'" *Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 456 (3d Cir. 2003) (quoting *Gehling v. St. George's Sch. of Med., Ltd.*, 773 F.2d 539, 542 (3d Cir. 1985)). The court finds that ECC has not carried its burden.

ECC alleges that Nestec and Nestlé's "participation in the design, manufacture, strategy and daily management establishes a *prima facie* showing for jurisdictional discovery." (D.I. 58 at 20). As previously mentioned, the Declarations of Nestlé's Senior Vice President and General Counsel, and Nestec's Vice President, directly contradict ECC's allegations. *See* (D.I. 69 ¶ 4) ("Nestlé S.A. had no role in the design, manufacture, distribution, marketing, or sale of the Nespresso Original Line machines."); (D.I. 55 ¶ 14) ("Nestec did not design or manufacture Nespresso's Original Line machines.").

ECC also relies on inadmissible evidence. A finding of personal jurisdiction, if contested under Rule 12(b)(2), requires factual evidence, and cannot rely on the bare pleadings or "affidavits which parrot and do no more than restate plaintiff's allegations without identification of particular defendants and without factual content." *Time Share Vacation Club v. Atl. Resorts*, Ltd., 735 F.2d 61, 66 (3d Cir. 1984). A plaintiff can satisfy its burden of establishing jurisdictional facts by submitting an affidavit, but that affidavit will only have value when it is "based on the affiant's personal knowledge or [is] admissible for some other reason." *Green Keepers v. Softspikes, Inc.*, No. 98-2255, 1998 U.S. Dist. LEXIS 15157, at *7 (E.D. Pa. Sep. 23, 1998).

One critical source for ECC's argument, Gaillard's declaration, does not supply the factual evidence required to defeat a 12(b)(2) motion; the portions of Gaillard's declaration which are based on "regular interaction with Nestlé Group executives" are not facts within Gaillard's personal knowledge, making them inadmissible hearsay. Fed. R. Evid. 801(c); *Green Keepers*, 1998 U.S. Dist. LEXIS 15157, at *8. The situation presented here closely mirrors the factual scenario in *Green Keepers*. There, the court found facts supplied in the "Carroll affidavit"—information derived from "unidentified Green Keepers representatives, golf products distributors and retailers, and [] from a magazine article"—to be clearly inadmissible hearsay. *Id.* at *8. The information supplied was not within Carroll's personal knowledge and the plaintiff did not allege other facts to establish the admissibility of the statements proffered. *Id.* Here, Gaillard similarly submits "facts" he learned from interactions with unnamed Nestlé executives; that evidence constitutes information in Gaillard's possession, not facts within his personal knowledge. Like the plaintiff in *Green Keepers*, ECC offered no other evidence to establish the admissibility of

11

Gaillard's hearsay statements. For that reason, the court finds that Gaillard's statements based on interactions with Nestle executives cannot be used to support ECC's burden of proof.

Gaillard's declaration also includes statements derived from his personal experience while working for Nestlé between 1988 and 1997. The court must disregard those statements as well because they would be inadmissible as speculation if used for the purpose of proving how Nestlé acted when the controversy occurred between 2009 and the present. Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."); *Green Keepers*, 1998 U.S. Dist. LEXIS 15157, at *8; (D.I. 24 ¶¶ 25–48); (D.I. 60 ¶¶ 2–8, 10, 13). These statements are also not supported by facts making them admissible for any other reason, and, therefore, do not have value in advancing ECC's burden.

Even if Gaillard's statements were admissible and therefore given weight, they would not establish a *prima facie* case as outlined by Supreme Court precedent. The Supreme Court instructed that demonstrating a *prima facie* case "requires more than labels and conclusions, and a formulaic recitation of the elements . . . will not do. . . . Factual allegations must be enough to raise . . . [the issue] above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). *See also Papasan v. Allain*, 478 U.S. 265, 286 (1986) (stating the court is "not bound to accept as true a legal conclusion couched as a factual allegation"). Although *Twombly* addressed pleading requirements as applied to a 12(b)(6) motion for failure to state a claim, the case bespeaks the change in standards of proof under Rule 12(b) from possibility to plausibility—a principle which is instructive for jurisdictional discovery in response to a 12(b)(2) motion. *See Ashcroft v. Iqbal*, 556 U.S. 662, 669 (2009) (stating *Twombly* "discussed the standard for evaluating whether a

complaint is sufficient to survive a motion to dismiss"); *In re: Dairy Farmers of Am., Inc.*, 767 F. Supp. 2d 880, 891 (N.D. Ill. 2011) ("The standards for reviewing the Keller's motions pursuant to Rule[] 12(b)(2) . . . are somewhat different from the standard for a Rule 12(b)(6) motion, but are related to one another."). To focus on plausibility, therefore, creates a more concrete benchmark which follows Circuit Court precedents. *See Autogenomics, Inc. v. Oxford Gene Tech. Ltd.*, 566 F.3d 1012, 1023 (Fed. Cir. 2009) (holding that jurisdictional discovery can be denied when it "appears to be both attenuated and based on bare allegations in the face of specific denials made by defendants"); *Boschetto v. Hansing*, 539 F.3d 1011, 1020 (9th Cir. 2008) (ruling that denying jurisdictional discovery is allowed when the request is "based on little more than a hunch that it might yield jurisdictionally relevant facts"); *Dever v. Hentzen Coatings, Inc.*, 380 F.3d 1070, 1074 n.1 (8th Cir. 2004) ("When a plaintiff offers only speculation or conclusory assertions about contacts with a forum state, a court is within its discretion in denying jurisdictional discovery.") (quoting *Carefirst of Maryland, Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 402 (4th Cir. 2003)).

The Supreme Court in *Iqbal* commented that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). ECC's evidence lacks facial plausibility. For instance, Gaillard states "[t]he Nestlé Group was and is run like a single, large, and integrated company," (D.I. 60 ¶ 5), but does not allege, in any manner, whether this method is unusual for a large corporation. Gaillard also states that "[a]s Nestlé Nespresso SA's CEO, I also interacted frequently with and took direction from Nestec SA regarding financial reporting, technical strategy and R&D." *Id.* This statement alone does not

13

establish, without additional pleadings or evidence, that parent companies normally do not structure their companies in this manner. Agency or stream of commerce theories are thus not applicable. A similar objection can be applied to Gaillard's statements that "Nestlé Nespresso SA, Nestec SA, and Nespresso USA employees report ultimately to Nestlé SA's EVPs," *Id.* ¶ 6, "Nestlé SA was and remains responsible for ultimate decision making with respect to the development and manufacturing of Nespresso products, productions, research and development and technical specifications," *Id.* ¶ 7, and other examples which allegedly support application of agency or stream of commerce theories to Nestlé and Nestec.

Common sense dictates that bare assertions such as these, even if all taken to be true, cannot support jurisdictional discovery. If jurisdictional discovery were granted on the pleadings and facts advanced by ECC, then any foreign company with a subsidiary in the United States could be forced into discovery when their subsidiary is sued. Such a precedent would render meaningless the purpose of the stream of commerce, agency, and minimum contacts test: that there exist a "relationship among the defendant, the forum, and the litigation." *Shaffer v. Heitner*, 433 U.S. 186, 204 (1977). When viewing a parent company and their subsidiaries, it would be expected that the parent supervises or otherwise guides their subsidiaries in some fashion. The agency and alter-ego theories were constructed and implemented by courts for situations in which a parent company abuses its position to the point where the subsidiary "had no separate mind, will, or existence of its own." *Ansel Props. v. Nutri/Sys. Assocs.* (In re Nutri/Sys. Assocs.), 178 B.R. 645, 653 (E.D. Pa. 1995). Even with the ability to hold the parent company liable, using this tool "is not to be done lightly . . . [e]ntities should be disregarded only in 'exceptional circumstances.'" *Burtch v. Opus, LLC* (In Re Opus East, LLC), 528 B.R. 30, 58 (Bankr. D. Del. 2015) (internal

14

citations omitted). As discussed in the previous sections, ECC has not brought forth evidence that this case should be deemed 'exceptional,' or that it has a *prima facie* possibility of being 'exceptional.' Therefore, even if all of Gaillard's assertions are taken as true, they do not provide sufficient information for the court to order jurisdictional discovery.

The court is also conscious of the financial burden of the discovery process in general, but particularly in antitrust cases. *See* William H. Wagener, *Note: Modeling the Effect of One-Way Fee Shifting on Discovery Abuse in Private Antitrust Litigation*, 78 N.Y.U.L. Rev. 1887, 1898–1899 (2003) (discussing the disproportionately high cost of discovery in antitrust cases). The Supreme Court advised that "[t]he costs of modern federal antitrust litigation and the increasing caseload of the federal courts counsel against sending the parties into discovery when there is no reasonable likelihood that the plaintiffs can construct a claim from the events related in the complaint." *Twombly*, 550 U.S. at 558 (quoting *Car Carriers v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984)). The great expense of discovery likewise applies when jurisdictional discovery is ordered, and should be considered when granting or denying the request. *See* Fed. R. Civ. P. 26(b)(1) (stating a consideration for the court when limiting discovery is "whether the burden or expense of the proposed discovery outweighs its likely benefit"); *Simons v. Arcan, Inc.*, No. 12-01493, 2013 U.S. Dist. LEXIS 44254, at *19 n.7 (E.D. Pa. Mar. 27, 2013) (noting a party might use jurisdictional discovery "to discourage litigation by increasing . . . [a party's] costs"); *Convergence Techs. (USA), LLC v. Microloops Corp.*, 711 F. Supp. 2d 626, 643 (E.D. Va. 2010) ("What is certain, however, is that jurisdictional discovery is expensive and time-consuming."). The court's analysis shows that ECC failed to establish a *prima facie* case of personal jurisdiction. Moreover, the evidence does not suggest with a reasonable likelihood that jurisdictional discovery

15

will evince Delaware's personal jurisdiction over Nestlé and Nestec. *Associated Gen. Contractors of Cal., Inc. v. Carpenters*, 459 U.S. 519, 528, n.17 (1983) (explaining the court "retain[s] the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed").

## V.  CONCLUSION

For the foregoing reasons, Nestlé S.A.'s and Nestec S.A.'s motion to dismiss for lack of personal jurisdiction is granted. (D.I. 51).

Dated: July 13, 2017

_____
UNITED STATES DISTRICT JUDGE